UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RENEE PETERSON, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| MICHAEL J. ASTRUE, | § | SA-06-CA-0275 RF (NN) |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

TO:   Hon. Royal Furgeson
      United States District Judge

### I. Introduction

Plaintiff Renee Peterson seeks reversal of the decision by the Administrative Law Judge (ALJ) to award her Supplemental Security Income (SSI) based on an onset date of March 21, 2000. Peterson contends that she was disabled beginning on October 11, 1997. Peterson seeks to have the decision of the defendant, the Commissioner of the Social Security Administration (SSA), denying her benefits for the time period October 11, 1997 to March 20, 2000 reversed. After considering Peterson's brief in support of her complaint,[1] the brief in support of the Commissioner's decision,[2] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in

---

[1] Docket entry # 11.

[2] Docket entry # 14.

this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff applications for benefits for disposition by recommendation.[3]

## II. Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Peterson fully exhausted her administrative remedies prior to filing this action in federal court. Peterson first filed for SSI benefits on August 28, 1999, alleging disability beginning October 11, 1997.[4] The Commissioner denied the application initially and on reconsideration.[5] Peterson applied for benefits again on September 17, 2002, once again alleging an onset date of October 11, 1997.[6] The Commissioner approved the second application on November 20, 2002 and awarded Peterson benefits based on an onset date of March 21, 2000.[7] The Commissioner determined that prior to that date, Peterson's overall medical condition permitted her to do some type of work. Peterson then asked for

---

[3]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[4]SSA record, p. 68.

[5]*Id*. at pp. 20, 23 & 31.

[6]*Id*. at p. 71.

[7]*Id*. at p. 35.

2

reconsideration to challenge the onset date.[8]  On March 28, 2003, the Commissioner denied that request and explained that insufficient evidence existed to show that Peterson was disabled prior to March 21, 2000.[9]  Peterson then asked for a hearing.[10]  A hearing was held before the ALJ on March 15, 2005.[11]  The ALJ issued a decision on April 25, 2005, concluding that Peterson was not disabled within the meaning of the Social Security Act (the Act) prior to March 20, 2000.[12]  Peterson then asked for review of the decision on July 27, 2005.[13]  The SSA Appeals Council concluded on February 24, 2006 that no basis existed for review of the ALJ's decision.[14]  The ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  On March 28, 2006, Peterson filed this action seeking review of the Commissioner's decision.[15]

### IV. Issue Presented

> Is the ALJ's decision that Peterson was not under a "disability," as defined by the Act, at any time prior to March 21, 2000 supported by substantial evidence and does the decision comport with relevant legal standards?

---

[8]*Id*. at p. 37.

[9]*Id*. at pp. 38-40.

[10]*Id*. at p. 41.

[11]*Id*. at p. 786.

[12]*Id*. at p. 11.

[13]*Id*. at p. 776.

[14]*Id*. at p. 5.

[15]*See* Peterson's complaint, docket entry # 1.

## V. <u>Analysis</u>

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[16] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[17] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[18]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[19] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[20] Conflicts in the evidence and credibility assessments

---

[16] *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[17] *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[18] *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[19] *Martinez*, 64 F.3d at 173.

[20] *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

are for the Commissioner and not for the courts to resolve.[21] Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[22]

**1. Entitlement to Benefits**

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[23] The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[24] A claimant shall be determined to be disabled only if her physical or mental impairment or impairments are so severe that she is unable to not only do her previous work, but cannot, considering her age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if she applied for work.[25]

---

[21]*Martinez*, 64 F.3d at 174.

[22]*Id*.

[23]42 U.S.C. § 1382(a)(1) & (2).

[24]42 U.S.C. § 1382c(a)(3)(A).

[25]42 U.S.C. § 1382c(a)(3)(B).

**2. Evaluation Process and Burden of Proof**

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[26] A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[27]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[28] If so, the claimant will be found not disabled regardless of her medical condition or her age, education, or work experience.[29] The second step involves determining whether the claimant's impairment is severe.[30] If it is not severe, the claimant is deemed not disabled.[31] In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[32] If it meets or equals a listed impairment, the claimant is deemed disabled without considering her age, education, or work experience.[33] If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of her past work.[34] If the claimant is still able to do her past work, the

---

[26] 20 C.F.R. §§ 404.1520 and 416.920.

[27] *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[28] 20 C.F.R. §§ 404.1520 and 416.920.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

claimant is not disabled.[35]  If the claimant cannot perform her past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given her residual capacities, age, education, and work experience, to do other work.[36]  If the claimant cannot do other work, she will be found disabled.  The claimant bears the burden of proof at the first four steps of the sequential analysis.[37]  Once the claimant has shown that she is unable to perform her previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account her exertional and nonexertional limitations, able to maintain for a significant period of time.[38]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that she is unable to perform the alternative work.[39]

**B. Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step four of the evaluation process.  At step one, the ALJ determined that Peterson had not engaged in substantial gainful activity since her alleged onset date.[40]  At step two, the ALJ determined that Peterson's migraines were a

---

[35]*Id.*

[36]*Id.*

[37]*Leggett*, 67 F.3d at 564.

[38]*Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[39]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[40]SSA record, pp. 15 & 17.

medically determinable impairment.[41] The ALJ characterized this impairment as severe.[42] At step three, the ALJ found that Peterson's migraines did not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 during the time period October 11, 1997 to March 20, 2000.[43] At step four, the ALJ found that during the time period October 11, 1997 to March 20, 2000, Peterson had the residual functional capacity to lift, carry, and push/pull 20 pounds on occasion and 10 pounds on a frequent basis. Peterson could sit, stand and/or walk 6 hours in an 8-hour day. She could also occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. She could not balance, or climb ladders, ropes, or scaffolds and she could not work at unprotected heights or around dangerous moving machinery.[44] Based on these findings, the ALJ determined that Peterson could have returned to her past relevant work during the time period October 11, 1997 to March 20, 2000.[45] Thus, the ALJ concluded that Peterson was not disabled as defined in the Social Security Act during the time period October 11, 1997 to March 20, 2000.[46]

### C. Peterson Allegations of Error

Peterson claims that the ALJ erred in determining that she was not under a disability during the time period October 11, 1997 to March 20, 2000 because the ALJ (1) failed to give the

---

[41]*Id.*

[42]*Id.*

[43]*Id.* at pp. 16-17.

[44]*Id.*

[45]*Id.*

[46]*Id.* at p. 18.

opinion of her treating physician controlling weight, and (2) failed to evaluate the episodic nature of her impairment.  The ALJ, however, had no evidence before him showing that Peterson was disabled during that time period.  The evidence of that time period comes from four sources: Peterson's medical records from the University Health System's transplant clinic, (2) treatment records from Dr. Robert D. Shoumaker, (3) a capacity assessment by Dr. G.L. John, and (4) testimony during Peterson's hearing before the ALJ.  That evidence is discussed below.

    <u>Transplant clinic records</u>.  Peterson's records from the transplant clinic show that Peterson had a liver transplant in 1990.  Because liver transplant patients have more illnesses that the average person, Peterson was seen by Dr. K. V. Speeg—Medical Director of Liver Transplantation—on a regular basis—at least every three months.[47]  The transplant clinic records show that Peterson suffered migraine headaches beginning as early as 1992,[48] that she had worked as a secretary as a federal employee,[49] and that she was medically retired under the Federal Employees Retirement System (FERS) in 1997 because her migraines caused her to miss too much work.[50]  Writing on January 4, 2005, Dr. Speeg discussed Peterson's history of migraines.[51]  According to Dr. Speeg, he first arranged for an evaluation of Peterson's problems with migraines in 1992.  He explained that a "complicated protocol was initiated with long-acting inderal."  He discussed the medications used in an attempt to control Peterson's migraines,

---

[47]*Id*. at p. 764 (explanation by Dr. Speeg).

[48]*Id*. at p. 182.

[49]*Id*. at p. 83.

[50]*Id*. at p. 82.

[51]*Id*. at pp. 763-66.

9

but explained that the medications did not provide significant relief. Peterson was evaluated by the Texas Headache Institute in 1994. This evaluation led to a new treatment plan that provided partial benefit. Peterson's headaches became more frequent beginning in September 1996. Dr. Speeg explained that the only treatment that had been successful was the use of morphine sulfate and phenergan given together intramuscularly.[52] Dr. Speeg supervised this treatment at the transplant clinic beginning in 1996 to ensure that Peterson could take her anti-rejection medications properly to protect her transplanted liver. Dr. Speeg explained that from the standpoint of the liver transplant, Peterson was essentially normal and was expected to do well for the next several decades. Dr. Speeg's prognosis for Peterson's experience with migraines, however, was not so optimistic. He explained that Peterson's migraines are unpredictable and disruptive, leaving Peterson unable to do little when a full-blown headache is present. Dr. Speeg opined that Peterson was unable to return to her previous work. Although this assessment supports the ALJ's determination that Peterson was disabled beginning on March 21, 2000, Dr. Speeg's earlier assessment does not indicate that Peterson was disabled prior to that time.

     Writing sometime in 1997, Dr. Speeg provided a similar assessment, but that assessment does not indicate that Peterson was unable to return to work.[53] The assessment is undated, but the content of the assessment indicates that Dr. Speeg provided the assessment at Peterson's request when she sought a medical retirement from FERS. As in the 2005 assessment, Dr. Speeg

---

[52] An [intramuscular] medication is given by needle into the muscle. This is as opposed to a medication that is given by a needle, for example, into the skin (intradermal) or just below the skin (subcutaneous) or into a vein (intravenous). http://www.medicinenet.com; then follow MedTerms Dictionary.

[53] SSA record, pp. 181-84.

discussed Peterson's problems with migraines. The 1997 assessment covered a much shorter period of time, but it made it clear that Peterson experienced periodic and disruptive migraines and that the occurrence and duration of Peterson's migraines were unpredictable. Dr. Speeg opined that there was little likelihood that Peterson's migraines would ever cease. Pertinent to Peterson's appeal, Dr. Speeg stated that he had not imposed any restriction of work activities. He explained as follows:

> My understanding of the situation is that the work quality is good during the headache free periods and that problem is the frequency for the headaches which, because of the work environment, limits productivity of the unit as a whole. The medical basis for not imposing restriction is the lack of evidence that such restrictions will benefit the patient.

Notably, this explanation does not indicate that Peterson is unable to work. At most, Dr. Speeg described the nature and severity of Peterson's migraines so as to support her application for a medical retirement, but he did not state that Peterson could not continue her work as a secretary. Although the 1997 assessment may have been enough to support a FERS retirement, it does not show that Peterson was disabled for the purposes of the Act. Disability for the purposes of the Act requires much more—it requires a determination that a person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[54] But in order for a person to be considered disabled for the purpose of a FERS medical retirement, the Office of Personal Management need only find that an employee is "unable, because of disease or injury, to render

---

[54] 42 U.S.C. § 1382c(a)(3)(A).

useful and efficient service in the employee's position."[55]  Consequently, Dr. Speeg's assessment supports the ALJ's determination that Peterson was not disabled during the time period October 11, 1997 to March 20, 2000.

The remainder of Peterson's medical records consists of transplant clinic progress notes documenting Peterson's follow-up visits for her liver transplant, the administration of Peterson's migraine medicine, and Peterson's bouts with pneumonia.[56]  Although it is apparent from the notes from the time period October 11, 1997 to March 20, 2000 that Peterson experienced frequent and painful migraine headaches, the notes contain no reference to Peterson's ability to engage in work—nothing in the notes suggests that Peterson's migraines prevented Peterson from engaging in any substantial gainful activity.  The transplant clinic records also include a Headache Residual Functional Capacity Questionnaire—dated November 12, 2002—in which Dr. Speeg indicated that Peterson's headaches would cause her to be absent from work about twice a month and that Peterson could not bend or stoop, but that Peterson could tolerate high stress work.  Because this assessment post-dates the time period that Peterson's challenges, it indicates that Peterson may have been limited in her ability to do work requiring bending or stooping, but does not suggest that she had no ability to work.  Consequently, Peterson's records from the transplant clinic support the ALJ's determination that Peterson was not disabled during the time period October 11, 1997 to March 20, 2000.  Although Peterson criticizes the ALJ for failing to accord controlling weight to Dr. Speeg's opinions, the ALJ's decision clearly accorded

---

[55] 5 U.S.C. § 8451(a)(1)(A).

[56] Ordinarily, I would cite to the applicable pages in the SSA record to support this summary; however, the record includes hundreds of pages of transplant clinic progress notes.

considerable weight to Dr. Speeg's opinion. For example, Dr. Speeg indicated in the November 12, 2002 Headache Residual Functional Capacity Questionnaire that Peterson could not bend or stoop. Consistent with that indication, the ALJ determined that Peterson could not balance, or climb ladders, ropes, or scaffolds and she could not work at unprotected heights or around dangerous moving machinery. Dr. Speeg did not indicate that Peterson could not return to her previous work in 1997 or that she could not engage in any substantial gainful activity.

Dr. Shoumaker's records. Peterson's medical records from Dr. Shoumaker also support the ALJ's determination. Dr. Shoumaker is a neurologist who prescribes the medication for Peterson's migraines—that medication is administered by the transplant clinic.[57] Dr. Shoumaker's records document his attempts to ascertain the source of Peterson's migraines and to determine an effective treatment plan. Dr. Shoumaker saw Peterson from July 23, 1996 until November 6, 1997,[58] and then on March 4, 1999[59] and September 29, 2003.[60] These records provide no information regarding Peterson's ability to work. These records support the ALJ's determination that Peterson was not disabled during the time period October 11, 1997 to March 20, 2000 because they do not indicate that Peterson was limited in her ability to work.

Dr. John's functional capacity assessment. Dr. John performed a functional capacity assessment on March 20, 2000.[61] This date appears to serve as the basis for the Commissioner's

---

[57]*Id*. at pp. 797-98.

[58]*Id*. at pp. 186-94.

[59]*Id*. at p. 196.

[60]*Id*. at p. 376.

[61]*Id*. at pp. 171-78.

determination that Peterson was not disabled prior to March 21, 2000. Dr. John determined that Peterson had the following limitations: Peterson could occasionally lift and/or carry 50 pounds; frequently lift/carry 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. Dr. John also determined that Peterson was not limited in her ability to pull and/or pull, other than as reported for lifting and/or carrying. Dr. John found no other limitations and opined that Peterson's alleged limitations were not supported by the medical records or any other evidence on file. This assessment does not indicate that Peterson was unable to engage in any substantial gainful activity. As a result, the assessment supports the ALJ's determination that Peterson was not disabled during the time period October 11, 1997 to March 20, 2000.

     <u>Hearing testimony</u>. During Peterson's hearing, Dr. Joe Berry testified that prior to March 21, 2000, Peterson's migraines did not meet section 11.03.[62] Section 11.03 is the listed impairment for epilepsy—the listing under which the Commissioner based his decision to award benefits beginning on March 21, 2000. The vocational expert was unable to comment on Peterson's ability to work during the time period October 11, 1997 to March 20, 2000.[63] Peterson testified about how the frequency of her migraines prevented her from working 40 hours per week, but she did not address the time period October 11, 1997 to March 20, 2000—*e.g*, she testified that she could not work 40 hours per week, but did not testify that she could not work 40 hours per week during the time period October 11, 1997 to March 20, 2000.[64] No one testified

---

[62] *Id*. at p. 794.

[63] *Id*. at p. 808.

[64] *Id*. at pp. 795-801.

that Peterson was unable to engage in any substantial gainful activity during that time period. Consequently, the hearing testimony supports the ALJ's determination that Peterson was not disabled during the time period October 11, 1997 to March 20, 2000.

Peterson complains that the ALJ failed to evaluate her ability to maintain employment given the episodic nature of her impairment. Although she maintains that she demonstrated that she is unable to sustain employment, she did not identify any evidence showing that she was unable to work during the time period October 11, 1997 to March 20, 2000. Peterson is correct that medical evidence establishes that her migraines "wax and wane," but the evidence does not establish that she was unable to engage in any substantial gainful activity prior to March 21, 2000. Without such a showing, she is not entitled to SSI benefits for the time period October 11, 1997 to March 20, 2000. Notably, Dr. Speeg indicated on November 12, 2002, that Peterson's headaches would cause her to be absent from work about twice a month.[65] The ALJ's hypothetical question to the vocational expert incorporated this limitation on Peterson's ability to sustain work activities on a regular basis.[66] The vocational expert testified that an employee who missed three days of work per month over an extended period of time would be terminated.[67] This answer indicates that Peterson would have been able to sustain regular work activities without being terminated prior to March 21, 2000. The ALJ's hypothetical and the vocational expert's answer demonstrate that the ALJ considered the episodic nature of Peterson's migraines and the effect the migraines had on Peterson's ability to maintain employment. Substantial

---

[65] *Id.* at pp. 463-66.

[66] *Id.* at p. 803.

[67] *Id.* at pp. 803-04.

evidence—indeed, all of the evidence—supports the ALJ's determination that Peterson was not disabled during the time period October 11, 1997 to March 20, 2000.

## VI. Recommendation

Based on the foregoing, I recommend that Peterson's request for relief (docket entry # 1) be DENIED and that the Commissioner's decision denying Peterson benefits during the time period October 11, 1997 to March 20, 2000 be AFFIRMED.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[68]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[69]  Additionally,

---

[68] 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[69] *Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[70]

**SIGNED** on April 9, 2007.

_____
NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[70] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).